Laura Carter Higley, Justice
Appellant, David Patrick Bertram, was found guilty by a jury of the offense of attempted aggravated kidnapping.[1] After finding an enhancement allegation-alleging that Appellant had been previously convicted of aggravated sexual assault of a child-to be true, the trial court sentenced Appellant to 50 years in prison.
Appellant raises three issues on appeal. In his first issue, Appellant contends that the trial court erred when it denied his motion to quash the indictment. In his second and third issues he contends that *664 the evidence was not sufficient to support the judgment of conviction.
We affirm.
Background
Twenty-year-old Fatima lived in a Houston apartment complex and worked at a restaurant. She worked nearly every day with her shift starting at 1:00 p.m. She got to work by walking, using the sidewalk along Mesa Street.
Mid-day on March 22, 2016, Fatima left her apartment and started her walk to work. She was talking on her cell phone as she walked. Fatima noticed a man, later identified as Appellant, standing at the bus stop. She passed him and continued to walk. Fatima glanced back and noticed that Appellant was walking about a car's length behind her. Her workplace is on the same side of the street as her apartment complex, so she normally did not cross the street. However, because she felt afraid, Fatima crossed to the other side of the street at an intersection.
When she crossed the street, Appellant followed her. He was a little over an arm's length behind her. Fatima looked back and saw Appellant reaching out with his hand towards her. Fatima later testified at trial that she began "to run, walk quickly," and that Appellant was "walking fast" behind her.
Fatima again crossed the street, but this time she crossed mid-block. Fatima ran across the street, but she tripped and fell as she reached the other side. Appellant followed Fatima across the street but was delayed by a passing car.
When asked what happened after she fell, Fatima testified that she began to crawl and that Appellant "walk[ed] slowly to where [she] was." She said she thought that Appellant "was going to grab [her] cell phone," but he did not. Instead, Appellant grabbed Fatima's left arm with both his hands and squeezed. Fatima testified that Appellant "wasn't helping me, he was hurting my arm."
During trial, the State offered photographs of points along Fatima's walking route on Mesa Street, including where Appellant grabbed Fatima. Fatima referenced the photographs as she testified.
Fatima testified that, after he grabbed her, Appellant "wanted to ... pull me towards a place." She said that he "pulled [her] backwards ... towards over here." She said that, when he pulled her backwards, she scraped her knee. She stated that the scrape "hurt [her] really bad."
Fatima saw that Appellant had a white handkerchief in his right hand. Appellant was moving the handkerchief toward her face. Fatima believed that Appellant was trying to put the handkerchief in her mouth. She testified that she started moving her head to prevent Appellant from putting the handkerchief in her mouth. When she moved her head, Appellant squeezed her arm harder.
A passing motorist, M. Thomas, saw Appellant "trying to grab" Fatima. Thomas testified at trial that Fatima looked "scared" and appeared to be "trying to get away from [Appellant]." Thomas's girlfriend, R. Jones, was also in the car. She saw Fatima walking quickly away from Appellant. Jones said that she saw Appellant trying "to trip" Fatima. Jones testified that Fatima was "trying to move back" from Appellant but then Appellant grabbed Fatima's arm. Jones believed that Appellant was "trying to mess with" Fatima.
Thomas and Jones decided to go back to help Fatima. As he turned his car around, Thomas saw Appellant grab the complainant by her shoulder and saw Fatima trip. Jones testified she saw Appellant "gripping"
*665 Fatima. She said that Appellant slipped, and Fatima "stumbled" with him. Jones saw Fatima pull away from Appellant and then Appellant reached out to grab Fatima again.
By the time Thomas and Jones reached them, Appellant and Fatima were in the parking lot of a tire shop. Thomas drove his car in between Appellant and Fatima, and he got out of the vehicle. Thomas saw that Fatima was scared, shaking, and crying. Thomas could not speak with Fatima because she speaks only Spanish.
Thomas said that Appellant then walked around the car "to get to [Fatima]." Thomas stopped Appellant and asked him what he was doing. Appellant told Thomas, "[M]ind your [own] business. You don't know what's going on." They asked Appellant how he knew Fatima, and he told them to mind their own business. Appellant said that he was just trying to ask Fatima the time. Jones testified that Appellant had a "crazy" and "scary" look on his face. Thomas described Appellant as being "semi-aggressive."
With the help of a Spanish-speaking employee of the tire shop, Thomas learned that Fatima did not know Appellant. Thomas told Fatima to get in the car. Appellant approached Thomas's car, and Thomas told him to step away because his two young daughters were in the backseat. Thomas told Jones to drive away with Fatima. Jones took Fatima to the restaurant where she worked and then returned to the tire shop.
Thomas asked the tire shop employees to call the police. Appellant then quickly walked away. Thomas and Jones flagged down a passing Houston Police Department patrol car driven by Officer M. Rocchi. They pointed down the street to Appellant. Officer Rocchi and his partner detained Appellant. Officer Rocchi testified that Appellant had "a very calm demeanor" and did not ask why he had been detained, which Officer Rocchi "found kind of odd."
Officer Rocchi went to the restaurant where Fatima worked. He observed that Fatima was still shaking and crying. He saw that she had scratches, bruises, and redness on her shoulder, which he agreed was consistent with someone grabbing and pulling her arm. Later that day, the police photographed Fatima. The photos show red marks on Fatima's arm.
Appellant was indicted for the offense of attempted aggravated kidnapping. Appellant filed a motion to quash the indictment, which was denied by the trial court.
At trial, the State offered the testimony of the Officer Rocchi, Fatima, Thomas, and Jones. The State's exhibits include photographs of the route walked by Fatima along Mesa Street and photographs of Fatima taken by police.
At the close of the State's case, Appellant moved for a directed verdict, asserting that the State had not proven the offense of attempted aggravated kidnapping. The trial court denied the motion.
A jury found Appellant guilty of the offense of attempted aggravated kidnapping. The trial court found "true" an enhancement allegation, alleging that Appellant had previously been convicted of aggravated sexual assault of a child. The trial court sentenced Appellant to 50 years in prison.
This appeal followed.
Motion to Quash the Indictment
In his first issue, Appellant complains that the trial court erred when it denied his motion to quash the indictment. The indictment, charging Appellant with attempted aggravated kidnapping, reads, in part, as follows:
*666 [O]n or about March 22, 2016, [Appellant] did then and there unlawfully, intentionally, with the specific intent to commit the offense of Aggravated Kidnapping of Fatima R[.] ... an act, to-wit: grab [Fatima] by her arm, cover [Fatima's] mouth, hold [Fatima], and pull [Fatima] from a public roadway, which amounted to more than mere preparation that tended to but failed to effect the commission of the offense intended.
Penal Code Section 20.04 identifies the possible aggravating factors that raise the offense of kidnapping to aggravated kidnapping. See TEX. PENAL CODE § 20.04(a)(1-6), (b). Section 20.04 provides that a kidnapping is aggravated when it is committed with the specific intent to accomplish one of six listed purposes or when a deadly weapon is used or exhibited during the offense. See id.
Appellant complains that the trial court erred when it denied his motion to quash because the indictment did not identify an aggravating factor. He asserts that, without knowing the aggravating factor on which the State would rely, he was unable to prepare a proper defense.
The State responds that Appellant waived his complaint about the indictment because he did not timely file his motion to quash. Article 1.14(b) of the Code of Criminal Procedure provides that a defendant must object to a defect, error, or irregularity of form or substance in an indictment "before the date on which the trial on the merits commences." TEX. CODE CRIM. PROC. art. 1.14(b). If he does not object before the date the trial commences, a defendant's objection to the indictment is waived. Id. A trial on the merits "commences" when the jury is impaneled and sworn. Sanchez v. State , 138 S.W.3d 324, 329-30 (Tex. Crim. App. 2004).
Here, the parties selected a jury at day's end on November 27, 2017. The next morning, Appellant filed his motion to quash the indictment and offered argument to the trial court in support of his motion. The trial court denied the motion. The jury was then brought into the courtroom and sworn. Because he filed his motion the same day that the jury was sworn, Appellant did not object to the indictment "before the date on which the trial on the merits commence[d]." TEX. CODE CRIM. PROC. art. 1.14(b). Thus, Appellant forfeited his objection to the alleged defect in the indictment. See id. ; see also McCoslin v. State , 558 S.W.3d 816, 820 (Tex. App.-Houston [14th Dist.] 2018, pet. ref'd) (holding appellant waived objection regarding sufficiency of indictment because motion to quash filed day trial commenced); Parker v. State , No. 09-16-00061-CR, 2017 WL 1424946, at *3 (Tex. App.-Beaumont Apr. 19, 2017, no pet.) (mem. op., not designated for publication) (holding motion to quash filed on same day that jury was impaneled and sworn was untimely); see also Jenkins v. State , No. PD-0086-18, --- So.3d ----, ----, 2018 WL 6332219, at *6 (Tex. Crim. App. Dec. 5, 2018) (designated for publication) (holding that defendant "forfeited any right to object" to indictment's defect because he did not object until second day of trial).
Even if error had been preserved, Appellant's complaint is without merit. Appellant complains that an element of the offense of aggravated kidnapping-specifically, the aggravating factor-was not alleged in the indictment charging him with the offense of attempted aggravated kidnapping. The Court of Criminal Appeals has made clear that "an indictment charging a consummated offense must properly charge all of the elements of that offense," but it has made equally clear that "an indictment charging an attempted offense *667 is not fundamentally defective for failure to allege the constituent elements of the offense attempted." Wood v. State , 560 S.W.3d 162, 168 (Tex. Crim. App. 2018) (holding that challenged indictment properly charged attempted capital murder even though aggravating factor, raising offense from murder to capital murder, not alleged) (citing Young v. State , 675 S.W.2d 770, 771 (Tex. Crim. App. 1984) ; Whitlow v. State , 609 S.W.2d 808, 809 (Tex. Crim. App. 1980) ; Jones v. State , 576 S.W.2d 393, 395 (Tex. Crim. App. 1979) ; Williams v. State , 544 S.W.2d 428, 430 (Tex. Crim. App. 1976). Thus, even if error was preserved, the trial court did not err by denying Appellant's motion to quash the indictment. See ids="9938836" index="10" url="https://cite.case.law/sw2d/544/428/#p430">id.
We overrule Appellant's first issue.
Sufficiency of the Evidence
In his second and third issues, Appellant contends that the trial court erred in denying his motion for directed verdict.
A. Standard of Review
An appellant's challenge to the trial court's denial of a motion for directed verdict is a challenge to the sufficiency of the evidence to support a conviction and is reviewed under the same standard. Williams v. State , 937 S.W.2d 479, 482 (Tex. Crim. App. 1996). We review the sufficiency of the evidence establishing the elements of a criminal offense for which the State has the burden of proof under a single standard of review. Matlock v. State , 392 S.W.3d 662, 667 (Tex. Crim. App. 2013) (citing Brooks v. State , 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) ). This standard of review is the standard enunciated in Jackson v. Virginia , 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). See Winfrey v. State , 393 S.W.3d 763, 768 (Tex. Crim. App. 2013).
Pursuant to the Jackson standard, evidence is insufficient to support a conviction if, considering all the record evidence in the light most favorable to the verdict, no rational fact finder could have found that each essential element of the charged offense was proven beyond a reasonable doubt. See Jackson , 443 U.S. at 319, 99 S.Ct. 2781 ; In re Winship , 397 U.S. 358, 361, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) ; Laster v. State , 275 S.W.3d 512, 517 (Tex. Crim. App. 2009) ; Williams v. State , 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We can hold evidence to be insufficient under the Jackson standard when (1) the record contains no evidence, or merely a "modicum" of evidence, probative of an element of the offense, or (2) the evidence conclusively establishes a reasonable doubt. See Jackson , 443 U.S. at 314, 318 & n. 11, 320, 99 S.Ct. 2781 ; Britain v. State , 412 S.W.3d 518, 520 (Tex. Crim. App. 2013).
The sufficiency-of-the-evidence standard gives full play to the responsibility of the fact finder to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. See Jackson , 443 U.S. at 319, 99 S.Ct. 2781 ; Clayton v. State , 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). An appellate court presumes that the fact finder resolved any conflicts in the evidence in favor of the verdict and defers to that resolution, provided that the resolution is rational. See Jackson , 443 U.S. at 326, 99 S.Ct. 2781.
In our review of the record, direct and circumstantial evidence are treated equally; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. Clayton , 235 S.W.3d at 778. Finally, "[e]ach fact need not point directly and independently to the guilt of the appellant, *668 as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." Hooper v. State , 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).
B. Elements of the Offense
To prove that Appellant committed the offense of attempted aggravated kidnapping, the State was required to present sufficient evidence that Appellant did an act amounting to more than mere preparation with the specific intent to commit aggravated kidnapping. See TEX. PENAL CODE § 15.01 (defining criminal attempt). A person commits the offense of aggravated kidnapping if "he intentionally or knowingly abducts another person" and commits an aggravating element. Id. § 20.04. Thus, two elements are required to prove aggravated kidnapping: (1) intent or knowledge to abduct, and (2) commission of an aggravating element. Id.
" 'Abduct' means to restrain a person with intent to prevent his liberation by: (A) secreting or holding him in a place where he is not likely to be found; or (B) using or threatening to use deadly force." Id. § 20.01(2). "Abduct," then, includes two elements. Laster v. State , 275 S.W.3d 512, 521 (Tex. Crim. App. 2009). First, the defendant must have restrained another, which is the actus reus requirement. Id. Second, the defendant must have had the specific intent to prevent liberation, which is the mens rea requirement. Id. "Secreting or holding another where he or she is unlikely to be found is part of the mens rea requirement of the offense-not the actus reus. This is an important distinction because the State is not required to prove that the defendant actually secreted or held another." Id. Instead, the State must prove that the defendant restrained another with the specific intent to prevent liberation by secreting or holding the person. Id. The offense of kidnapping is legally completed when the defendant, at any time during the restraint, forms the intent to prevent liberation by secreting or holding another in a place unlikely to be found. Id.
Pertinent to this case, a kidnapping is aggravated when a defendant intentionally or knowingly abducts another with the specific intent to accomplish one of the following six purposes:
(1) hold him for ransom or reward;
(2) use him as a shield or hostage;
(3) facilitate the commission of a felony or the flight after the attempt or commission of a felony;
(4) inflict bodily injury on him or violate or abuse him sexually;
(5) terrorize him or a third person; or
(6) interfere with the performance of any governmental or political function.
TEX. PENAL CODE § 20.04(a).[2]
At trial, the State argued that Appellant had attempted to abduct Fatima with the intent to inflict bodily injury or to violate or abuse her sexually. See id. § 20.04(a)(4). Thus, "the State was required to prove that [Appellant] committed an act beyond mere preparation with the intent to secrete or hold [Fatima] and commit an aggravating element-not that [Appellant] could, or did, actually accomplish this purpose." Laster , 275 S.W.3d at 522.
C. Analysis
Intent to abduct Fatima
Appellant contends that the evidence admitted at trial was not sufficient *669 to prove that he intended to abduct Fatima, that is, that he intended to hold or to secrete Fatima in a place where she was unlikely to be found. See TEX. PENAL CODE §§ 20.01(2)(A), 20.04(a). The State asserts that the Court of Criminal Appeals's holding in Laster compels us to conclude that the evidence was sufficient. See Laster , 275 S.W.3d at 524. We agree.
In Laster , eight-year old B.T. and her ten-year old brother were walking on the sidewalk. Id. at 515. Laster walked toward the children and, as he passed by them, Laster grabbed B.T.'s arm. Id. at 516. He then put his arm around her waist. Id. B.T.'s brother grabbed her hand and a tug of war over B.T. followed. Id. Laster abruptly let go of B.T. when a passing motorist honked the car's horn. Id. Laster walked away and went to a nearby store. Id. The children ran home and told their mother what had occurred, and Laster was arrested. Id. He told the police that voices had told him to grab B.T. Id. Laster was convicted of attempted aggravated kidnapping. Id.
Among his arguments on appeal, Laster claimed that the evidence was not legally sufficient to support his conviction. Id. Laster asserted that the evidence was legally insufficient to support the jury's finding that he intended to hold or secrete B.T. in a place where she was unlikely to be found. Id. at 522.
In support of this assertion, Laster presented three arguments. First, Laster suggested that the State did not prove that he intended to take B.T. because he grabbed her in front of possible eyewitnesses. Id. The court stated that "the jury was not precluded from inferring that Laster intended to secrete or hold B.T. in a place where she was unlikely to be found simply because he restrained her in public." Id. The court noted that it had previously recognized that "a rational factfinder can infer such an intent when a defendant isolates a person from anyone who might be of assistance." Id. (citing Fann v. State , 696 S.W.2d 575, 576 (Tex. Crim. App. 1985) ). The court cited evidence that Laster had grabbed B.T. by the waist and "tried to pull her away" and that her brother had "grabbed her arm and pulled back." Id. The court concluded that "[t]he jury could reasonably infer from this testimony that by pulling B.T. away from her brother, the only person available to help her, Laster intended to hold or secrete B.T. in a place where she was unlikely to be found." Id.
Laster next asserted that "there [were] other reasonable explanations for why he grabbed B.T.," such as to steal the bicycle B.T. was pushing as she walked or to sexually abuse her on the spot. Id. Laster claimed that, "[w]ithout proof that one explanation was more reasonable than another, ... the evidence was insufficient." Id. The court did not agree, stating that Laster's "reasoning invade[d] the factfinder's role." Id. The court noted that "[i]t is up to the factfinder to 'resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " Id. (quoting Jackson , 443 U.S. at 319, 99 S.Ct. 2781 ). It criticized Laster's argument because it "improperly applied the outdated reasonable hypothesis construct." Id. The court stated, "As long as the verdict is supported by a reasonable inference, it is within the province of the factfinder to choose which inference is most reasonable." Id. at 523. It reiterated that "the evidence showed that Laster grabbed and then pulled B.T. toward him." Id. Laster continued to pull B.T. even after her brother came to her aid. Laster did not release B.T. until a driver honked the car's horn. Id. The court determined that "[a] factfinder could reasonably infer from this evidence that Laster *670 was planning to do more than just steal her bike or molest her." Id.
Finally, Laster argued that "the evidence showed that he intended only to grab B.T. because his confession did not imply otherwise" and he had "let go of her within a matter of seconds." Id. In his confession, Laster had said that voices not only told him to grab B.T., they also told him to "get her, get her." Id. He had said that he let go of B.T. when he saw B.T.'s brother, and he realized that he "needed to let go of her because she was a little girl and [he] knew how that would look to the cars going by.' " Id.
The court stated that, "[e]ven if this evidence was believed, a rational factfinder could infer that Laster formed the intent to take B.T. when he grabbed her and abandoned his plan when he realized that other people were witnessing his actions." Id. It pointed out that the evidence had also shown that "Laster released B.T. when a driver honked the car's horn." Id. The court determined that "[r]ather than concluding that Laster released B.T. because he just wanted to grab her, viewed in the light most favorable to the verdict, the evidence showed that Laster formed the intent to take B.T. when he grabbed her and let go because he feared that he may be caught." Id. The court held that the evidence was legally sufficient to support the judgment convicting Laster of attempted aggravated kidnapping. Id. at 524.
The facts here are analogous to those in Laster . The evidence showed that the incident occurred mid-day along Mesa Street, which Officer Rocchi described as a "very busy" road with "a lot of vehicular traffic." Fatima testified that Appellant grabbed her arm after she fell trying to flee from him by crossing the street mid-block and that he followed her across the street. Fatima said that, when he grabbed her, Appellant did so in a manner that was hurting her, not helping her.
Jones and Thomas also saw Appellant grab Fatima. They were concerned by what they saw, so they turned around to help Fatima. Jones said that she saw Fatima pull away from Appellant, and he tried to grab Fatima again.
Fatima testified that, after he grabbed her, Appellant "wanted to ... pull me towards a place." She said that he "pulled [her] backwards ... towards over here." She testified that, when he pulled her backwards, she scraped her knee. The State offered into evidence photographs of the route Fatima and Appellant had walked along Mesa Road. Along the route, at different points, were bushes, a park, and a bridge. There was also a photo of the spot where Appellant grabbed her.
This case also contains evidence probative of Appellant's intent of a nature even more incriminating than that presented in Laster . Fatima testified that Appellant had a white handkerchief in his hand that he moved toward her face as he restrained her. Fatima believed that Appellant was trying to put the handkerchief in her mouth. She testified that she moved her head, preventing Appellant from doing so. He gripped her tighter when she moved her head. Given that the evidence showed this was a visible public location, the jury could have reasonably inferred that Appellant was pulling Fatima backward and attempting to silence her with the handkerchief because he intended to hold or secrete her in a place where she was unlikely to be found. See id. at 523.
Appellant also remarks that Fatima's testimony regarding the handkerchief was "newly announced" and "not corroborated by any other witness or report." However, it was the jury's role to resolve conflicts in the testimony and to weigh the *671 evidence. See Jackson , 443 U.S. at 319, 99 S.Ct. 2781 ; Zuniga v. State , 551 S.W.3d 729, 733 (Tex. Crim. App. 2018). We may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. Arroyo v. State , 559 S.W.3d 484, 487 (Tex. Crim. App. 2018). Instead, we must defer to the credibility and weight determinations of the factfinder, including its determination regarding Fatima's testimony. See Cary v. State , 507 S.W.3d 750, 757 (Tex. Crim. App. 2016).
As in Laster , the evidence also showed that a passing motorist interrupted the offense. See 275 S.W.3d at 523. Appellant did not release Fatima until Thomas and Jones turned their car around and returned to assist Fatima. Unlike Laster, Appellant did not immediately cease his pursuit of Fatima and leave the scene. Cf. ids="8211456" index="76" url="https://cite.case.law/sw3d/275/512/#p517">id. Thomas testified that Appellant was "semi-aggressive," telling the couple to mind their own business. Appellant continued to approach Fatima until Thomas further intervened, and Jones drove Fatima to her workplace. The jury could have further inferred that Appellant abandoned his plan only because Thomas and Jones intervened and steadfastly protected Fatima. See ids="8211456" index="77" url="https://cite.case.law/sw3d/275/512/#p517">id.
Appellant points out that Fatima testified that she initially thought that Appellant was trying to steal her cell phone. Fatima was talking on her cell phone as Appellant followed her. She testified that she had the cell phone in her hand before and after Appellant grabbed her and while she struggled with Appellant. However, Appellant did not take Fatima's cell phone. Nor was there any evidence that the cell phone was the target of his efforts. To the contrary, the evidence suggested that Appellant had an opportunity to snatch the cell phone from Fatima's hand but did not. This evidence, plus Appellant's acts of pulling Fatima and attempting to silence her with the handkerchief, supports an inference by the jury that the purpose of Appellant's actions was not to steal her cell phone but some other nefarious purpose, specifically abducting Fatima.
Appellant suggests that Laster does not apply because the complainant there was a child, and Fatima is an adult. However, Appellant does not explain the significance of these factual differences. Neither the Penal Code nor the case law requires greater evidence to prove an attempted-aggravated-kidnapping offense involving an adult victim than an offense involving a child victim. See TEX. PENAL CODE §§ 15.01, 20.04. Appellant also remarks that "simple restraint does not support a conviction of attempted aggravated kidnapping." However, the evidence showed that Appellant pulled Fatima backward and made efforts to gag her with a handkerchief. See Laster , 275 S.W.3d at 523. Thus, evidence was presented from which the jury could have reasonably inferred that Appellant intended to do more than simply restrain Fatima. Considering the totality of the evidence, the jury could have reasonably inferred that Appellant intended to hold or secrete Fatima in a place where she was unlikely to be found. See ids="8211456" index="79" url="https://cite.case.law/sw3d/275/512/#p517">id.
Intent to inflict bodily injury
Appellant also contends that the evidence is insufficient to prove that he intended to cause Fatima bodily injury. See TEX. PENAL CODE § 20.04(a)(4). "Bodily injury is broadly defined in the Penal Code as 'physical pain, illness, or any impairment of physical condition.' " Laster , 275 S.W.3d at 524 (citing TEX. PENAL CODE § 1.07(a)(8) ). "Direct evidence that a victim suffered pain is sufficient to show bodily injury." Id.
*672 Fatima testified that Appellant hurt her arm when he grabbed her and pulled her backwards. Officer Rocchi testified that Fatima "had some scratches and bruises and redness" on her left shoulder. Photographs of Fatima taken soon after the incident show red marks on her arm. Fatima testified that her knee was scraped when Appellant pulled her. When asked how that felt, Fatima said that "it hurt me really bad." "Because '[o]ne's acts are generally reliable circumstantial evidence of one's intent,' the jury could reasonably infer that [Appellant] intended to do exactly what he did-to inflict bodily injury on [Fatima]." Id. (quoting Rodriguez v. State , 646 S.W.2d 524, 527 (Tex. App.-Houston [1st Dist.] 1982, no pet.) ).
Given the evidence presented at trial and viewing it as we must, a rational trier of fact, charged with discerning Appellant's intent from the surrounding circumstances, could have found beyond a reasonable doubt that Appellant intended to inflict bodily injury on Fatima and to hold or secrete her in a place she was unlikely to be found. See ids="11314333" index="84" url="https://cite.case.law/sw2d/646/524/#p527">id. Affording appropriate deference to the jury's verdict, we hold that the evidence supporting Appellant's conviction is sufficient. See ids="11314333" index="85" url="https://cite.case.law/sw2d/646/524/#p527">id.
We overrule Appellant's second and third issues,
Conclusion
We affirm the judgment of the trial court.

See Tex. Penal Code §§ 15.01, 20.04.

The offense of aggravated kidnapping is also committed if a person "intentionally or knowingly abducts another person and uses or exhibits a deadly weapon during the commission of the offense." Tex. Penal Code § 20.04(b).